at the outset I would ask that I would I would note that my colleague Dr. David Gibbs extends his great apologies for not being able to be here with us today and his sincere appreciation for the court rescheduling the argument the first time in attempts to allow him to argue. I'm not Dr. Gibbs but I'm going to do my very best this morning for you. My name is Brian Tome. I am appearing on behalf of the Balanced Solid Rock Baptist Church, Bible Baptist Church of Andrew Reese, Charles Clark Jr. and Charles Clark III. With the court's permission I would reserve four minutes for rebuttal because I anticipate the court will have many questions I may need to address on rebuttal. At the outset appellants have instructed me to say that they recognize the governor has a very difficult job. They love their governor. They pray for him daily. In this case they simply have a fundamental disagreement with him about the nature of what is and what is not essential and have been aggrieved by his decision to treat worship as a non-essential activity under some of his executive orders. But how can we now afford you any relief when the very order that you're complaining of has not been in effect for over two years? So the governor of New Jersey still retains the state of emergency power and could enact the re-enact the order. That's not the question. What relief can we give you? You want declaratory relief and an injunction but there's nothing to enjoin and there's nothing to declare. I mean people retain power but that's not the issue. Yes respectfully your honor what I would ask for is declaratory judgment in joining the governor from future, issuing future executive orders that do not provide for either a religious exemption or... When would anything ever be moot if we chose to invoke that kind of power here because whether it's the governor or mayor or other government executives, they theoretically have different powers. So what you're asking is prospective relief. Don't ever let this happen again. That's what you're asking for. An order that is not in effect now. That's correct judge and I think that most recently the court drew our attention to the West Virginia versus EPA case which has a similar set of circumstances where the administrative body in West Virginia versus EPA chose not to pursue the rules that they had previously installed. They began another rulemaking process. They specifically stated that they had no intent to re-enact the old rules essentially and still the Supreme Court viewed it as a voluntary cessation exception to the mootness doctrine, received the case and issued an opinion. Now admittedly Justice Kagan in her dissent criticized that as an advisory opinion or more of an advisory opinion. Well the holding wasn't the holding right? I'm sorry? I mean in her view it wasn't the holding was that part of the opinion essential to the holding of the opinion? It was essential for the review of the underlying issues. This case is a little different because there have been no factual determinations and in this case it's rule 12b-6 motion or the dismissal was granted on rule 12b-6 motion. So as of today there's been no findings of fact as to either the pendency of the pandemic or the likelihood of reoccurrence or the governor's intent moving forward. I still get back to the relief. You say you want a declaratory judgment enjoining but an injunction has to be based upon irreparable injury, immediate irreparable injury. I still don't understand how you satisfy the requirements for the relief that you say you want us to deliver. Your Honor I believe that in this case the irreparable harm is the fear, the harm that's being avoided is the fear that the governor may reimpose at any time. I'm going to go back to what Judge Greenway said. If fear is a basis for an injunction then we're going to be granting injunctions every which way. That can't be so. Well I believe under the voluntary cessation exception to the mootness doctrine you can still review the behavior of a government agency. Well let's talk about the behavior then, right? So it's not just that, well let's think about this for a moment. So over two years ago there was an order. That order is no longer in effect. In the two years since then there have been a lessening of restrictions on religious gatherings until there came a point where there was no restriction on religious gatherings. So you're asking, if I'm understanding you correctly, you're asking us in the absence of an order to issue an injunction against any action by any government official in the Third Circuit going forward that might impede religious gatherings. We have not asked for any government official, simply the governor in this case. The governor of New Jersey? Yes, Your Honor. So there's nothing that impedes your client if we unfortunately have another medical emergency from at that time seeking relief, right? That is true, Your Honor. Maybe I misunderstood your point then, counsel. I thought what you were asking was for us to find that the case is not moot, that it's justiciable and that the district court can proceed to consider the merits. And I thought you would say that if you have to file a new lawsuit every time something comes up it becomes the much described game of whack-a-mole that would never allow you to get before a court. Is that your argument? It is, Your Honor, and that's why I distinguished this case as a 12B6 motion for dismissal as opposed to many of the other cases that were cited in the briefs where there were actual factual findings on the record before it got up to consideration on appeal on the mootness doctrine. Under voluntary cessation there would have to be no reasonable likelihood that the complaint of restrictions will return in order for it to be not moot. But on the other hand, the restrictions that would occur would have to be substantively comparable to those that have already been in effect. How can we conjure up a scenario given the current state of affairs and it's pretty factual as to the fact that New Jersey did not seek to impose these restrictions, re-impose them once there were surges. How can we conjure up that this is going to recur and a restriction substantively comparable is going to be imposed? Especially because of the Supreme Court precedent in the meantime saying, you know, not only are religious situations to be treated the same, they're pretty special. How do we conjure up that there's going to be a substantively comparable restriction imposed? So if I may Judge Rendell, there's a few things in that question that I'd like to address. First of all, the idea that we would need to conjure up a new set of, as one of my law professors would have called it, a parade of horribles that would bring us back to this point, would have been alien to us before January of 2020. Yeah, but we have vaccines now. I mean, the parade of horribles, the likelihood of the parade of horribles is much less. It may be much less with respect to the COVID-19 pandemic, but we're constantly warned. Isn't that what we're talking about? Well, we're constantly warned by public health officials that there are additional threats of additional viruses. But is that what we're really talking about? We're talking about we have to go beyond COVID and say, oh, there could be something else. Isn't the whole point of mootness that the same situation is going to be revisited so we should hear it? It is the same situation, Your Honor, with respect to the governor's executive order and his failure to treat religious organizations or religious communities. But it has to be the same situation in terms of the parade of horribles. It has to be the same parade of horribles, doesn't it? So for the capable of repetition yet evading review exception to mootness, it has to be the same parade of horribles. And for the voluntary cessation, I would argue that it does not. I think it has to be substantively comparable. How can it be the same parade of horribles if we have substantive evidence of changes in the manner and severity of COVID-19 and its variants? We have evidence. In the papers, it's alluded to, there's no evidence. We have evidence of how the governor reacted in those instances, right? There are facts alleged, there are facts in common. If in those instances, the governor didn't go back to EO-103 or EO-107, then why is your fear now a reasonable fear, right? Because that's what we have to find in order to give you the relief you're seeking. Yes, Your Honor. One of the other things that I wanted to address about Judge Rendell's question previously is the lay law criteria is that in instances of voluntary cessation, that it has to be absolutely clear that there's no reasonable expectation that the agreed conduct will recur. What's unclear about the last two years? I think it's seven or eight, maybe nine executive orders after 103 and 107, right? In our line of work, you'd say that's a body of work to look at, right? You know what to expect and you have evidence to examine. How can we come to the conclusion that you are hoping for us to come to when we have that in front of us? Respectfully, Your Honor, I would have thought prior to April of 2022 that I knew what to expect in the city of Philadelphia. But all of a sudden, at the beginning of April 2022, there was a new mask mandate in place because of a resurgence of COVID questions. And as Judge Mabee pointed out, it is the state's burden to prove that the aggrieved harm is not reasonably likely to occur. In this case, the governor of New Jersey has not signaled or stated an intent to follow the new Supreme Court's ruling, controlling ruling in this case. We need a statement by a governor that he's going to follow the Supreme Court? Really? In other cases, I'm out of time. No, you're not. In other cases, a statement by the executive has been part of the analysis that has satisfied the court that there is no intent by the state or no reasonable problem. Counsel, let me take it in a different direction. The statement shows it's way far afield. Was there any pattern or practice by the state following the Supreme Court's decision in Roman Catholic Diocese? What did the state do in response to the Supreme Court's decision? For two months, the governor did nothing. So the Supreme Court's decision came down, and for two months, nothing changed. Was there anything for the governor to do at that point? Specifically, I think in answer to Judge Mabee's question, in that two-month period, were there restrictions or impositions on religious gatherings that were in contravention of Roman Catholic Diocese? There were. That's a good question, Your Honor, and if I can answer that on rebuttal, I would like the opportunity to do so. You want to take a look at that? Yes, Your Honor. I'd like you to. Okay. Yeah, and we'll get back to that. Thank you. Yeah, thank you. Good morning. Good morning. Matthew Burns for the State Appellees. May it please the Court. Appellant's challenge to the 10-person gathering limit in Executive Order 107 is moot. Unless you have something really exciting to say. I want to jump right in. Of course, Your Honor. Okay, so you just heard what I asked your colleague, so I know you have that at the tip of your tongue while he's scurrying around. So stop his scurrying by telling us what the governor did and what the governor was required to do based on your reading of Roman Catholic Diocese. We can certainly start there. So after Executive Order 107, the governor incrementally relaxed the restrictions that had initially been imposed on religious gatherings. So by the time that Roman Catholic Diocese was decided in November of 2020, the restriction that applied to religious gatherings was 150 people or 25% of capacity. And that restriction was much more generous than the restriction that applied to non-religious gatherings. At that time in November, the cap that applied to non-religious gatherings was 10 people again. That cap had been the same at the outset and then increased and then the governor lowered the cap that applied to non-religious gatherings while maintaining the cap that applied to religious gatherings at 150 people or 25% of capacity. So you'd say that Roman Catholic was much more restrictive? Yes, that's correct, Your Honor. The restrictions that were at issue in Roman Catholic Diocese were 10 people and 25 people, and the governor continued to relax the restrictions that applied to them. Didn't the district court get it wrong here, saying that plaintiffs have come forth with no evidence? It's really a heavy burden on the defendant, the person saying this is moot, to demonstrate there's no reasonable likelihood that the complaint of restrictions will return. Why should we not send this back to the district court to re-weigh the evidence in light of the heavy burden that you should have had to bear? I don't read the district court's opinion to place the burden on plaintiffs in this case. It said plaintiffs have come forth with no evidence. There is no evidence that the restrictions that are at issue are going to be reinstated. But that's not the burden. You have the burden to show there's no reasonable likelihood that the complaint of restrictions will return. So how are we supposed to review that, or shouldn't the district court be advised that it put the burden on the wrong place and needs to reassess the situation? Your Honor, the review is de novo, and I think the court can address that in the first instance. I don't think that this is a case where the burden really matters. Okay. What evidence was there? What is the showing that there's no reasonable likelihood? So I think that we would point to the significantly changed public health circumstances, and these are all factors that other courts around the country have looked at. And first, I would say that there have been vaccines that have been introduced. There are new therapeutics. We now have widespread testing. We have a better understanding of how the virus spreads and the efficacy of masking. And we have our track record, as the court pointed out previously, over the course of the pandemic in 2021-2022, where restrictions were not reintroduced in response to the surges and hospitalizations and cases during the Delta and Omicron waves. And I do want to address specifically one point that my friend on the other side made, and that's regarding a statement from the executive. I want to call the court's attention to a statement that was issued on March 17th of this year. In connection with an expected rise in cases where the governor said that, at this time, we do not anticipate any need to reinstate universal statewide mandated protective measures. How does that meet the standard that the Supreme – we were just picking up on Judge Rendell's question then, but how is that – the Supreme Court has described that your burden is that it must be absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The statement you're making, the representations you're offering, I understand them, of course, to be genuine, but how does that meet that highly – high standard of absolute certainty? It's a standard that, of course, state governments have been able to meet in a number of other cases involving challenges to COVID executive orders, and that's the case in circuit decisions from around the country that applied the voluntary secession standard and put the burden on the government to demonstrate that there was no reasonable expectation that the challenged conditions would be reinstated. You said earlier that the burden doesn't – who has the burden doesn't matter. I wasn't sure I followed that. Oh, that is because of all of these cases that I just referenced where it's clear that the court is placing the burden on the government and that the government can meet it. So my point regarding the burden not mattering is that even if one applies the voluntary secession standard and requires the government to demonstrate that it's absolutely clear that the challenged conduct will not recur, we've met that standard here. Let me ask you this question. When you read Roman Catholic Diocese of Camden, right, how do you read the effect those cases would have on the governor's ability in the future to issue any restriction on religious gatherings? I just want you to talk to me about what you think the contours of the governor's ability are or the breadth of the governor's ability to do that given those two cases. Of course. So those cases apply strict scrutiny to restrictions that were imposed by states that drew problematic distinctions between religious and comparable non-religious conduct. In Camden, the court says that it does not matter whether the state treats some religious conduct the same as or better than some comparable non-religious conduct provided that the state treats religious conduct worse than some comparable non-religious conduct. In any case, the strict scrutiny standard is going to apply and the state is going to have to meet that burden. So that doesn't mean that there can be no restrictions on religious gatherings, it means that they need to be no more restrictive than the restrictions that apply to... Your Honor, the restrictions that are at issue here are from Executive Order 107. That executive order was relaxed months before a Roman Catholic Diocese was decided and so we think... That's right, but the question, I thought Judge Green always started saying, well, if we go back in time and look at the restrictions that were imposed that are the basis of the suit, do those comport in the state's view of Roman Catholicism? I think that's something that the state would certainly need to consider in the event that it was ever going to evaluate imposing restrictions like this again. It doesn't sound like absolute certainty that it couldn't be imposed again. I guess that's the problem. Well, absolute certainty, I think, is dependent not on just the change in the law, although that's certainly a factor that courts have looked at and I can certainly commit to the court, as I just did, that we would be guided by Roman Catholic Diocese in Camden and all of the other intervening decisions. Were you guided by Roman Catholic for the 13 months after Roman Catholic that the state continued the prosecution of the plaintiffs? Regarding that time frame, I would note that the municipal court litigation was stayed for an extended period, I believe, at the request of the appellants. Eventually, that stay was lifted. My understanding is that that occurred after the district court's decision. At that point, the state agreed to dismiss the case. That is consistent with the approach that the state took with regard to other violations of the executive orders involving religious conduct. At this point, we're not aware of any of those charges that are still pending. It just seems like a complicated puzzle to assemble, right? That the EO was lawful because it was issued in response to the emergency and that's what justified the criminal prosecution and the state would abide by the Supreme Court's decision, but it didn't take the cue from the Supreme Court and Roman Catholic to say, well, obviously we can't proceed with criminal charges. It left them there and it was, I think, only after this appeal was filed that the state moved to withdraw them. I'm just trying to square all of this with your representation, which I, of course, take with certainty that the state isn't going to restart this, but it sounds as though it's not clear what is still going to be on the table or isn't. Again, I think that it is absolutely clear that the restrictions are not going to be reinstated because of the changed circumstances, and that is true regardless of whether the state thinks that the original restrictions that were imposed would be consistent with Roman Catholic diocese or not. Does Roman Catholic diocese lower the threshold for First Amendment cases such as this? In other words, the court there says injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified. The governor regularly changes the classification of particular areas without prior notice. If that occurs, the reclassification will certainly bar individuals in the affected area from attending services before judicial relief can be obtained. It's almost like the Supreme Court is lowering the showing required in an area involving religious rights. Your counsel talked about fear, and isn't that what Roman Catholic is concerned with, the threat and the fear? Your Honor, I think that, as Judge Greenaway pointed out during the prior argument, it needs to be a reasonable fear, and in the absence of a reasonable expectation that the state is going to reimpose the restrictions that are being challenged here, that abstract concern is not the kind of concern that can preserve Article III jurisdiction and ensure that there's a case of controversy. I don't think that Roman Catholic diocese really changes the mootness analysis. The mootness analysis is applied differently depending on the doctrinal basis of the challenge restriction. I want to make sure that I understand something. My question is prompted by Judge Beatty's question to you. The governor couldn't impose those restrictions now, so that's why it couldn't possibly come up again? Is that too broad? Going forward, I think I would say that the state would certainly be guided by Roman Catholic diocese in Tandon, and certainly if the state were to adopt Executive Order 107 tomorrow, that would provide the framework under which we would have to defend that statute, or that executive order rather. But really, we have no interest in litigating whether Executive Order 107 is consistent with Roman Catholic diocese or Tandon, because we have no interest in reinstating Executive Order 107. So we're not here today asking the court to give its blessing to Executive Order 107. We're not defending the merits because we don't need to. There's no reason to address that going forward. My question doesn't arise because of a blessing, which I think is kind of funny given this context, but it's really whether in making the argument that it's moot, part of that analysis would be, well, we couldn't do it again anyway because of the breadth of Roman Catholic. That's where my question arises. Yeah. We have not gone back and looked at the record that might support Executive Order 107 under the legal framework that was established by the Supreme Court months later. Again, that's certainly something that the state would need to do if it were to reconsider imposing Executive Order 107 again. But then why can't the district court consider the plaintiff's claim for permanent injunctive relief? Because what I'm hearing you saying is, well, we don't know that Roman Catholic would prevent this. And I understand that. You have to assess your litigation positions. But then why does that not leave live the controversy for permanent relief? Your Honor, I think it's really too abstract at that point. That kind of hypothetical situation is not the kind of scenario that falls within Article III and that the court can appropriately address. So that's a standing claim then, right? Not arguing they don't have standing. It's standing and mootness. It's two different things. One's protected, one's Article III. So I thought the state's position was, yes, they have standing, but the court should decline to exercise it if the case is moot. Standing is assessed at the time that the lawsuit is filed, and mootness is considered over the course of the lawsuit at all times. It needs to be an Article III case or controversy, and that's what the mootness doctrine is designed to address. You mentioned that you don't – the state doesn't have an interest in defending the EO because it has no intention of imposing the EO against that. That's correct. In West Virginia, the Supreme Court says the government's mootness argument boils down to its representation that it has no intention of enforcing the challenge conduct, and the court said that just simply doesn't do. So we swap out West Virginia for Europe. Isn't it the same argument? I think the facts in West Virginia are really quite different. In West Virginia, the government and the EPA represented that it's not going to seek to enforce the precise aspects of the Clean Power Plan that it had adopted in 2015, among other reasons because the deadlines for compliance had already passed and the thresholds for the environmental standards had already been satisfied in the meantime. But there was every indication in that case that EPA was actively undertaking a new rulemaking that would perhaps impose different standards and different deadlines but be predicated on the same exact theory that underlied the 2015 Clean Power Plan, which was a generation-shifting theory under Section 111D of the Clean Air Act. So I thought part of your argument would be that the state action there and here is entirely distinct because there, I think the section Judge Mady is focusing her attention on, the court says here the government, quote, nowhere suggests that if this litigation is resolved in its favor, it will not, close quote, reimpose emission limits predicated on generation-shifting, which you just alluded to. Indeed, it vigorously defends the legality of such an approach, and I took, maybe improperly, you'll correct me if I'm wrong, I took your approach to be entirely different from that. You were quicker to the point than I was, Your Honor. We are not vigorously disputing the merits in the way that the government was in West Virginia versus EPA. If you look at the brief that the EPA filed in that case, they spend two-thirds of it litigating the merits. That's in stark contrast to this case where you're not getting any merits argument from us. And even in the district court, when we filed our motion to dismiss, we moved to dismiss on grounds of moodness, younger abstention, and 11th Amendment immunity, so far as the plaintiffs then were raising state law claims. But even by the beginning of 2021, when we filed that motion to dismiss, we were not pressing the merits or seeking to defend Executive Order 107 under Roman Catholic diocese. Isn't this case different or unique because there are really two likelihoods that have to be addressed. The likelihood that the pre-vaccine COVID conditions will reoccur such that the restrictions would be called into place. So it's not totally the guacamole of, OK, they're just going to do it again with the same facts. The facts don't change. They're just going to do it again. Here, it seems to me, you've got the additional likelihood or the reasonable certainty, whatever, that we're going to have that same horrible situation that calls for the restricted gatherings. And then, in light of that, there's a likelihood the governor will reinstate. Would you agree? That's exactly right, Your Honor. And I think that's our principal argument, is that public health circumstances have changed so dramatically. That that first likelihood won't even occur. That that first likelihood won't even occur. And in particular, we adopted the 10-person limit that was at issue here for less than three months at the beginning of 2020 in order to help keep the ICU capacity in hospitals and the ventilator capacity in hospitals below their limits. Those were really dark days, and we certainly hope that we don't return there. And Roman Catholic was a November 2020 decision. That's absolutely correct. In the heat of the constant changing. Yes. I just have one follow-up question on a question Judge Mady asked you, because I want to make sure that I have the facts in mind. On the criminal charges, I think I heard you say, I want to make sure that I'm right on this, that after the issuance of 107, the charges were stayed. Roman Catholic comes out. The district court opinion comes out, and I guess 14 days later, it was filed for an appeal. But that's the point in time that you looked at the stay? And also, forgive me if I don't remember this, what you're about to tell us is in the record, right? Aspects of it are in the record. Limit yourself to the aspects that are in the record. The state is not actually a party to the prosecution, so we have limited information about the specific timeline. What I can point the court to is docket entry 74 in the district court, which is a letter from appellant's counsel notifying the court of the stay. And that the proceedings in municipal court have been stayed pending a decision from the district court on appellant's motion to reconsider the ruling on the preliminary injunction. And then I would also point the court to the transcript from the preliminary injunction hearing in this case. That's from August 2020 at pages 6 and 18, where there's a discussion of appellant's request that the state proceedings be stayed pending developments in the federal litigation. So it stayed at the appellant's request and then at some point, if this is in the record, if it's not, and at some point the appellant's passed, that the stay be lifted? Or it's by order of the court? That's not in the record. What is in the record is that charges were dismissed in December of 2021. Thank you. Is there a claim properly pled here for damages? And if so, how does that affect the Moodness Doctrines? There's not. And in responding to the motions to dismiss that were filed by the county and local defendants in the district court, appellants responded by saying that they had only a claim for prospective relief so that the immunity, excuse me, the immunity doctrines that were being invoked did not apply. If there are no further questions, I ask that the court please affirm the decision below. Thank you. Thank you. All right. You've had, I guess, at least 15 minutes of research. Your Honor, Your Honor was kind enough to let me off the hook by asking my opponent. And my opponent was correct that by the time the Dices and Tandon came out, the cases came out, the Roman Catholic Dices and Tandon cases came out, the executive orders treated religious observance more favorably than standard gatherings. What do you say to the notion that you have, there are two likelihood issues here as compared to a situation like West Virginia and EPA where it's clearly a guacamole walk down and they just do it again. It comes up right away. You've got the likelihood that we're going to have this situation that is going to be like it was two years ago. And the likelihood that in response to that situation, they're going to impose that restriction. Aren't there two junctures here where you have to look at the likelihood of the repeat events? I think there are, Your Honor. And that's in several of the cases that we cited, there is an assessment by the court of how likely the state is to engage in the same type of restrictions. First it has to be that that situation will arise and then that their response will be what it was. That's correct, Your Honor. I think most of the cases skip over the first prong of that analysis because it's presumptive that if you get to the second prong of the analysis, you had the first. But I don't think any of them were. This could be decided on the first prong, basically. I suppose that it could if you found that there was no reasonable – that the state had shown that it was absolutely clear that there was no reasonable expectation that COVID would reoccur. Then I suppose you don't get to the second portion. Let me ask you this question. You alluded to this when you were with us before, and I just want to make sure that I'm not overstating or overthinking what your position is. Do I take your position to be that the only way for this to be moved is that Governor Murphy no longer have the power to issue an executive order of this type? No longer have the power to place religious observance on the same par with non-essential activities. So if I may, Your Honor – But if you argue that Roman Catholic does that – well, Roman Catholic intended to do that, then why isn't it moved? Well, if Roman Catholic intended to do that, Your Honor, why did it take the state 13 months to dismiss the criminal charges? That's not the question. The question is if you believe that that is the effect of those two cases, then why isn't it moved? Because under the – You can't have it both ways, right? Because under the voluntary cessation doctrine, there is at least a premise by which the court should decide an issue to prevent future bad conduct from the actor. So it's a corrective measure in this case, I think, simply because, as we alluded to, and as Judge Mady pointed out, there was a 13-month window between Roman Catholic Diocese and Tandon where two of the appellants that are sitting in this room today were under threat of criminal prosecution. And the initial – Were you under the threat of criminal prosecution when the prosecution stayed? So, yes, Your Honor, you're still a criminal defendant in the case, and we still appeared every month for a status conference with the municipal court judge to update her on the status of the case. But that was the judge, that wasn't the governor. That's a different issue. Well, I sought relief from the governor. I asked that the cases be dismissed after Roman Catholic and Tandon. So we were seeking dismissal for unfair treatment under E.O. 107, and it wasn't granted for 13 months. Right, but that's – I think the judge's point is that the fact that that happened is not within the aegis of the governor. The dismissal of the charges was not within the aegis of the governor? Yeah, the governor can't order charges to be dismissed in a state court. Government does not have that power. Separation of powers. The governor – I mean, unless you're alluding to the pardon power. No, I'm not alluding to the pardon power, but the Department of Justice is – Well, that's federal. I thought you were referring to the Attorney General's office. The Attorney General's office, I'm sorry. The Department of Law and Public Safety has some sort of ability here, but I don't want to get too far out of this because I don't know how much is in the record or is even there. I want to go – can we go back to Judge Greenaway's question because I want to make sure I understand your argument? I thought you were saying this court, like the district court, has nothing before it that says that the state agrees with the representation that Roman Catholic and Tandon do not allow for the conduct that was challenged in the lawsuit, and that as we sit here today, the state's position is unclear. They're certainly representing that they have no intention, imminent or otherwise, to reimpose the restrictions, but they're leaving open the possibility that the conduct originally charged comported with the constitutional standards the Supreme Court outlines. I thought your point was we have no idea if the state believes that those decisions constrain their activity as originally imposed in the EO. That's correct, Your Honor, but I would also add that there is still that threat of the potential reasonable likeliness that the conduct will reoccur, and it still is the state's burden to disprove that. So as to the point that there's – we don't have any idea, it is the state's burden to bring forward the proof of that, meeting that standard. Okay. Can you confirm that the complaint does not and has not sought – do you have the word damages? The amended complaint did seek damages, but my opponent is correct. We did withdraw those monetary damages on principled grounds at the motion to dismiss stage. So we are not seeking monetary damages here. I would also note that my opponent pointed out that the adoption of the 10-person limit was less than three months, but it treated religious – it was three months under which it treated religious observance less favorably than things like operating a bicycle repair shop or operating a liquor store. So in that sense – Is this your essential services argument? Yes, Your Honor. And what – well, are you pressing that claim in this context now, that part of the – part of the aggrievement, if you will, was not being deemed to be an essential service? It's part of the underlying request for the declaratory judgment. You want us to declare that religious – Religious observance or worship. Religious worship is an essential service? Yes, Your Honor. It clearly – it is clearly entitled to that status. It is – it's a preferential right. It's embodied in the First Amendment of the United States Constitution in Article I, Paragraph 3 of the New Jersey Constitution. I'm not questioning the importance of understanding, you know, the ability to gather. It's an essential – it's just – is it an essential service? But I just wanted to make sure you were still pressing it. In this case, it's definitely an essential service to my clients. The appellants in this case view it as a biblical mandate to meet in person. And under Executive Order 107, they were prohibited from doing that. And in their eyes, that's a sin before God. It's a direct contradiction of His Word. Listen, I'm not getting in the way of anyone's path to the Lord. That's not the question. But, okay. I think my time's expired, so unless the Court has any other questions. Thank you so much. Thank you very much for your time, Your Honor. Counsel, thank you for these interesting arguments. We're going to take the matter under advisement. And I believe we are finished for today.